UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.R.S. ENTERPRISES, INC., ) | |
| ) | |
| Plaintiff and Counterclaim ) | |
| Defendant, ) | |
| ) | |
| v. ) | Civil Action No. 05-1823 (CKK/JMF) |
| ) | |
| SHEET METAL WORKERS' ) | |
| INTERNATIONAL ASSOCIATION, ) | |
| LOCAL 40; and THE NATIONAL JOINT ) | |
| ADJUSTMENT BOARD FOR THE ) | |
| SHEET METAL INDUSTRY, ) | |
| ) | |
| Defendants and Counterclaimants. ) | |

**MEMORANDUM OPINION and ORDER**

Before me is an application and supplemental application for attorneys' fees and expenses incurred by the Sheet Metal Workers' International Association, Local 40, defendant and counterclaimant (the "Union") in this action. In total, the Union seeks as much as $94,704 in fees and $1410.44 in expenses.

M.R.S Enterprises, Inc., plaintiff and counterclaim defendant ("M.R.S."), objects to the reasonableness of the fees on two grounds: (1) the hours expended by Union counsel were unreasonable, and (2) Union lawyers are seeking fees at hourly rates that are greater than those they charged their client.

I shall deal with each issue in turn, addressing, first, the specific objections of M.R.S. to various entries in the Union lawyers' time records.

I.      **The Reasonableness of the Hours Expended**

   A.      <u>Time spent on issues not raised by M.R.S.</u>

M.R.S. first complains that Union counsel spent 31.5 hours preparing the Answer and Counterclaim, which included four hours on issues "that were not raised by the Plaintiff, including benefit funds and legal research in to (sic) the right to picket for an 8(f) agreement." <u>Plaintiff/Counterclaim Defendant's Opposition to the Counterclaimant's Application for Attorney Fees</u> ("Opp.") at 2.

There are many cases where a lawyer presumes she must cover issues and arguments that she reasonably believes may bear on the court's ultimate decision even though her opponent has not raised them. Thus, the true standard for disallowance of attorneys' fees would be the expenditure of time on issues and arguments that no reasonable lawyer would believe had any relevance or significance to her client's claims. I have reviewed the Answer and Complaint and I cannot say that the four hours spent on the legal issue of the right of unions to picket for what are called § 8(f) agreements were, on their face, so irrelevant and insignificant that addressing the issue was a waste of time. To the contrary, as Union counsel point out, the Union has to establish that, as a matter of law, it had the right to picket for such an agreement so that it could argue that it had given up the right to picket for a new § 8(f) agreement in return for what is called "interest arbitration." <u>See</u> <u>Counterclaimant Sheet Metal Workers Local 40's Motion to Confirm Arbitration Award</u> at 26. That argument is persuasive; indeed, M.R.S. did not even answer it.

Furthermore, I have indicated that the proper standard to determine if the time spent on a particular issue was reasonable is whether a reasonable lawyer would have

2

devoted time and effort to that issue, even though his opponent did not raise it. I have reviewed the briefs carefully and I cannot find that, under the standard I have articulated, no reasonable lawyer would have devoted the time and effort that Union counsel did to the issue M.R.S. now protests.

      B.      <u>Call to representatives of benefit funds.</u>

M.R.S. takes exception to a half-hour phone call from Union counsel to "Eileen Marks" on October 24, 2005. Union counsel explain that the call was necessary for proper consideration of whether their client, the Union, should "urge the benefit funds[1] to intervene, or whether the Union should avoid delay and seek to have the award enforced first." <u>Counterclaimant Sheet Metal Workers Local 40's Reply to M.R.S. Enterprises' Opposition to Application for Attorneys' Fees</u>, at 3. I cannot possibly describe counsel's doing that as a waste of time; to the contrary, it was legitimate for Union counsel to consider the tactical advantages and disadvantages of asking the benefit funds to intervene.

      C.      <u>Hours spent reviewing opinion.</u>

M.R.S. also takes exception to Union counsel charging 20 hours to read Judge Kollar-Kotelly's decision in this case and to Union counsel spending "over 20 hours talking to each other on the telephone or in e-mail communications." Opp. at 2. But, as Union counsel point out, the vast majority of entries that contain references to telephone conferences, email communications, or to reviewing the judge's order also specify what other things counsel did in addition to telephone conversations, emails, and reviewing the judge's order. Having reviewed each entry, I cannot find that the time claimed for the

---

[1] Though undefined by the parties, the term "benefit funds" appears to collectively refer to the organizations that administer the funds the Union uses to pay benefits to members.

3

protested activities is unreasonable, nor am I ready to rule that lawyers discussing with their colleagues matters of importance in their cases is in itself a waste of time.

       D.       <u>Legal research.</u>

M.R.S. also asserts two objections to the time Union counsel spent doing legal research.

It first argues that counsel in this case also served as Union counsel in <u>Law Fabrication, LLC v. Local 15 of the Sheet Metal Workers Int'l Assoc. Bd. of Trustees, AFL-CIO</u>, 396 F. Supp. 2d 1306 (M.D. Fla. 2005), and that case, like this one, involved the interpretation of Article X, section 8, of what appears to be a standard industry collective bargaining agreement. M.R.S. argues that it is unreasonable for the Union lawyers to have spent 28.1 hours on legal research as to the interpretation of Article X, section 8, the issue that they had addressed in the <u>Law Fabrication</u> case. Opp. at 3.

But the briefs in the <u>Law Fabrication</u> case are available public documents and M.R.S. did not submit them to the Court to show that the work in this case duplicated the work in that case. In the absence of those briefs, M.R.S.'s contentions as to what the Union lawyers did or did not have to do anew is nothing more than speculation.

Second, M.R.S. argues that "it strains credulity that Local 40's law firm would expend that amount of time on issues that it had successfully briefed in the <u>Law Fabrication</u> case, supra, which was decided on October 6, 2005, the very month that Local 40's law firm was working on its Answer, Counterclaim and Memorandum of Law in this case." Opp. at 3. But an examination of the decision in <u>Law Fabrication</u> indicates that the court there resolved the following issues: (1) jurisdiction over the subject matter under (a) section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185,

and (b) section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a), 1132(e),[2] and (2) one of the issues presented here, whether Article X, section 8, of the collective bargaining agreement created interest arbitration.  On the other hand, an examination of Judge Kollar-Kotelly's opinion in this case shows that she resolved the one issue the two cases had in common as well as the following additional issues: (1) whether jurisdiction and venue were proper in this court; (2) whether M.R.S. has conceded all issues, other than that the arbitration award was moot, by not contesting those issues; (3) irrespective of that concession, whether M.R.S. was bound by the 2001-2005 agreement, although it did not sign it; (4) whether the agreement required negotiation for a successor term; (5) whether the negotiations were deadlocked; (6) whether M.R.S. could not challenge the composition of the arbitration board; and (7) whether M.R.S. did not show that it had one or fewer sheet metal workers; had it done so, it could have terminated the collective bargaining agreement without consequence.  M.R.S. Enterprises, Inc. v. Sheet Metal Workers Int'l Ass'n, 429 F. Supp. 2d 72 (D.D.C. 2006).  Thus, the Union lawyers had to address issues that were not adjudicated in the Law Fabrication case and I cannot fairly reduce the fees they claim here because they were successful in two cases that shared a single common legal issue.

    E.    Fee petition.

M.R.S. also objects to the fees sought for the preparation of the original fee petition and its supplement.  I have examined the entries and I found that the partner ("MJA" in the fee petition) did most of the work on the original fee petition but the associate ("AJS") did most of the work on the supplement.

---

[2] All references to the United States Code are to the electronic versions that appear in Westlaw or Lexis.

In reviewing fee petitions, I am always concerned about the twin problems of "under" and "over" delegation. "Over" delegation occurs when a more experienced lawyer delegates responsibilities to a junior, who then spends more time than necessary because of her inexperience. "Under" delegation occurs when the senior attorney performs tasks that do not require her experience. See Vigilant Ins. Co. v. EEMAX, Inc., 362 F. Supp. 2d 225, 227 (D.D.C. 2005).

In this case, I can see no reason to reduce the fees for preparation of the fee application and its supplement. The billing entries suggest that the partner reviewed the junior lawyer's research, analysis, and drafts, and that the more junior lawyer performed the lion's share of the work on the supplemental fee petition that repeated the arguments as to the proper rate already set out in the original fee petition. I see no compelling suggestion of over or under delegation on which to base a reduction of fees for preparing the original and supplemental fee applications.

**II.    The Rate to Be Charged**

There are three hourly rates at issue in this case. First, the Union lawyers explain that they provide legal services to the Union at a discounted hourly rate of $205 for partners and $185 for associates "because of the public-service nature of our representation." Declaration of Michael T. Anderson in Support of Application for Attorneys' Fees ¶ 12. He and the Union therefore agreed that, if the Union lost, the Union would pay the discounted rate, but if the Union won, "our firm would charge the prevailing market rate contingent on recovery of fees." Id. ¶ 13.

The Union offers, however, two calculations of the market rate.[3]  The first is the Laffey rate[4] that appears on the United States Attorney's Office Web site.[5]  This represents the fees the Civil Division of the United States Attorney's Office will pay without requiring the movant to prove that those are the market rates in the District of Columbia.  Each year the matrix is updated according to the increases in the Consumer Price Index for all goods and services.  The second calculation takes the same Laffey matrix and updates it according to the component of the Consumer Price Index specifically relating to legal services.  Use of the latter makes a substantial difference as illustrated by the following chart:

| Years of Attorney Experience | Laffey Rate, as calculated by U.S. Attorney's Office | Laffey Rate, as calculated using legal services component of Consumer Price Index |
|---|---|---|
| 20+ | 405 | 549 |
| 11-19 | 360 | 456 |
| 8-10 | 290 | 404 |
| 4-7 | 225 | 280 |

As is obvious, the difference is not pocket change.  If the Laffey rate as calculated by the United States Attorney's Office is used, the Union seeks fees of $71,970, but if the

---

[3] Mysteriously, M.R.S. relies on a decision from the Northern District of Illinois for the proposition that federal courts begin their determination of what is a reasonable attorneys' fee by ascertaining a reasonable hourly rate. Opp. at 5.  Unfortunately, in arguing that the Union lawyers are entitled to only the discounted rate they charge labor unions, M.R.S. ignores controlling precedent in this Circuit for the proposition that, when counsel offer a certain class of clients a discounted rate in the public interest, they are entitled to the market rate, not the discounted rate. Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1524 (D.C. Cir. 1988) (en banc).  They also ignore that this Court looks to the Laffey rates as establishing the market rates for lawyers in this jurisdiction. See Lopez v. District of Columbia, 383 F. Supp. 2d 18, 24 (D.D.C. 2003).

[4] The Laffey matrix is based on the leading opinion on this issue, Laffey v. Northwest Airlines, Inc., 572 F Supp. 354, 371 (D.D.C. 1983).

[5] The current Laffey matrix may be viewed online at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_5.html.

7

Laffey rate using the legal services component of the Consumer Price Index is used, the Union seeks $94,704, a difference of $22,734.

In the first case in this district to confront the issue, Salazar v. District of Columbia, 123 F. Supp. 2d 8 (D.D.C. 2000), the court heard testimony from an expert witness that the *components* of the Consumer Price Index are a better tool to update a particular industry's practices than the *entire* Consumer Price Index. Id. at 15. Because the "[d]efendants have failed to offer any reasoned, or expert rebuttal to the explanation," the court concluded that what it called the "updated" Laffey matrix more accurately reflects the prevailing legal rates for legal services in the D.C. community. Id.

In Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694 (3rd Cir. 2005), one party advanced the argument that the holding in Salazar should be applied to its application for fees in a lawsuit tried in New Jersey. Id. at 710. The court of appeals, describing itself as "underwhelmed" by the evidence tendered in support of that contention, nonetheless found that the district court's determination to use the Laffey rate used in Salazar was not clearly erroneous. Id.

Finally, in an even more recent decision, the court that decided Salazar found that the use of the updated Laffey rate was reasonable and consistent with existing precedents. The court used it again, noting that the defendant did not challenge its use. Smith v. District of Columbia, 466 F. Supp. 2d 151, 156 (D.D.C. 2006).

But, it is certainly not the law of this Circuit that the more expensive Laffey rate must be used universally. To the contrary, all that can be said is that, since Salazar, a court, based on the record before it, found that (1) the use of the updated Laffey rate was not unreasonable or clearly erroneous and (2) the use of the updated Laffey rate was

8

reasonable when the defendant did not object to its use. That scarce authority causes me to persist in the view that use of the updated Laffey rate must be justified by a significant evidentiary record that shows why its use is reasonable in a particular case. See Yazdani v. Access ATM, Civ. No. 06-639, 2007 WL 5428062 at *4 (D.D.C. Feb. 21, 2007); McDowell v. District of Columbia, Civ. No. 02-119, 2006 WL 1933809 at *2 (D.D.C. Jul. 11, 2006). In this case, there is no record whatsoever on which to base the conclusions that (1) use of the updated Laffey rate is reasonable; (2) use of the traditional Laffey rate is unreasonable; and (3) without using the updated Laffey rate in this case as the Union lawyers request, there would be few lawyers, either public-spirited or otherwise motivated, who would come forward to represent labor unions.

I therefore conclude that the Union should recover $71,970 in fees and $1,410.44 in costs, representing the fees sought at the traditional Laffey rates as used by the United States Attorney's Office.

### III. CONCLUSION

For the reasons aforementioned in this Memorandum Opinion, it is hereby **ORDERED** that Plaintiff and Counterclaimant, M.R.S. Enterprises, Inc., shall pay a total of $71,970 in attorneys' fees and $1,410.44 in costs to Defendants and Counterclaimants Sheet Metal Workers' International Association, Local 40, and the National Joint Adjustment Board for the Sheet Metal Industry.

A separate judgment to enforce this Order shall be entered by the clerk.

                                                   _____/s/_____  
                                                   JOHN M. FACCIOLA  
                                                   UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2007